UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14CR152 RWS/NCC |
| | ) | |
| CHARLES WOLFE, a/k/a "Chuck Wolfe," | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
ON MOTIONS FOR *FRANKS* HEARING AND TO SUPPRESS EVIDENCE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

Before the court are defendant Charles Wolfe's pretrial motions for a hearing under *Franks v. Delaware* and to suppress evidence. (Doc. Nos. 586 and 587). There are twenty four 24 search warrants at issue.[1] The government has responded. (Doc. Nos. 559 and 560). The pretrial motions filed in this case were first filed by defendant in a related analogue-conspiracy case, which is styled as *United States v. Mark Palmer, et al.*, Case No. 4:14CR175 AGF/DDN (E.D. Mo. June 5, 2014). Defendant Wolfe is named as a co-defendant in the *Palmer* case. The government has characterized these two cases as overlapping conspiracies. The court has consolidated certain pretrial matters across the Analogue cases because of their size and scope. In this case, defendant Wolfe is charged in Count I with conspiracy to distribute and possess with the intent to distribute controlled substances and controlled substance analogues, in violation of

---

[1] Defendant Wolfe draws no distinction between the individual warrants in the instant case and the *Palmer* case. The government does not address whether defendant Wolfe has a privacy interest in each of the search warrants. It has suggested that it will offer all of its evidence against every defendant. Therefore, the undersigned will treat the 24 search warrants collectively.

21 U.S.C. §§§ 813, 841 and 846.  Count II alleges a conspiracy to introduce and to receive

misbranded drugs in interstate commerce, in violation of 18 U.S.C. § 371 and 21 U.S.C. §§ 331

and 333.  Count III alleges a conspiracy to launder money, in violation of 18 U.S.C. §§ 1956 and

1957.

On March 8, 2016, defendant Wolfe moved that the undersigned adopt certain pretrial

motions that were initially filed jointly with co-defendants in the *Palmer* case.  (Doc. No. 505).

Because the government's evidence against defendant Wolfe here is the same (or substantially

similar) evidence that it seeks to offer against him in the *Palmer* case, the undersigned granted

defendant Wolfe's motion to adopt on March 23, 2016.  Thereafter, U.S. Magistrate Judge David

D. Noce held an evidentiary hearing, on May 27, 2016, in the *Palmer* case on the pending

motions to suppress evidence and for a *Franks* hearing.  The undersigned has reviewed the

pending Motions and Responses, exhibits, the transcript of the pretrial hearing held before Judge

Noce, and his Order and Recommendation on Motions For *Franks* Hearing And To Suppress

Evidence issued on November 4, 2016.  (*Palmer,* ECF No. 292).

Defendant Wolfe challenges the admission of evidence against him.[2]  His *Franks* motion

contends, as it must, that the affidavits in the 24 search warrants were false, misleading or

---

[2] On July 16, 2014, the government filed its initial disclosure of arguably suppressible evidence pursuant to Fed. R. Crim. P. 12(b)(4).  Attachment #1 to the disclosure delineates the evidence as specific "events" and identifies which defendant has "standing" to challenge the evidence. Defendant Wolfe is not identified individually as the target of any specific event; but there are events listed by the government that apply to all defendants charged.  Reference is made to trash runs at one location in St. Charles, Missouri and three search warrants, several related seizures at locations in St. Charles and St. Louis, Missouri.  On December 1, 2014, the government filed a response regarding pretrial disclosure of evidence that included reference to approximately 20 to 30 boxes of records seized from defendant Wolfe and co-defendant Mark Palmer.  The government also disclosed that it was waiting for the search results from an electronic tablet and a "second" computer seized from defendant Wolfe.  *See* (Doc. No. 204).  Subsequently, the government filed regular status reports of discovery disclosed as ordered by the court within which they explained that investigators seized a variety of electronic storage devices.  The

inaccurate. He asks the court to disregard the offending passages and to make a determination that the search warrants lacked the legal sufficiency to issue. He also asks that the court suppress the evidence seized. Specifically, defendant Wolfe argues that the 24 search warrants should not have issued because (a) they contain reckless statements that are false, misleading and inaccurate that were set forth by (b) affiants lacking the scientific expertise to make such claims. Therefore, the affidavits do not meet the constitutional requirements of the Fourth Amendment. It follows that the success on his suppression motion is tied closely to the court's determination of the merits of his motion for a *Franks v. Delaware* hearing, and any relief to be granted on that basis. Defendant also reserved the opportunity to present specific reasons to the court for suppressing the government's evidence following an evidentiary hearing. (*Palmer*, ECF No. 263, *Transcript of Hearing*, at p. 18).

### Findings of Fact

The content of the 24 federal search warrants at issue and their supporting documents speak for themselves. The search warrant packages are incorporated by reference as if fully set out here. They are the best evidence of their contents.[3] *See* (Doc. No. 586, Def. Exs. 1 through 10). Moreover, another Magistrate Judge of this court has made detailed findings of fact and conclusions of law about the pretrial motions filed by defendant Wolfe in the *Palmer* case. The government's evidence against defendant Wolfe in this case is the same or similar evidence it seeks to offer in *Palmer*. In light of the Reports and Recommendations already issued; the identical claims raised by defendant Wolfe in the *Palmer* case and here; and the extensive,

---

government also used a variety of investigative techniques to obtain evidence, including consent searches, pole camera surveillance, review of bank records, and searches and seizures after obtaining search warrants. *See* (Doc. Nos. 215, 228, 288, 380 and 380-1).

[3] The undersigned also incorporates by reference the findings of fact made by Judge Noce in his review of the challenged search warrants.

thorough pretrial briefing and oral argument undertaken by the parties, the undersigned will set forth a limited statement of facts for the trial court's convenience.

In summary, Drug Enforcement Administration (DEA) special agents conducted a long-term investigation of defendant Wolfe and other individuals alleged to be involved in the distribution of controlled substances, controlled substance analogues and materials used for trafficking this contraband in several states. The affiants explained that in the event that some of the chemical compounds they suspected were trafficked by defendant Wolfe and others were not found to be a controlled substance analogue, they also pursued evidence of other crimes such as the violation of 21 U.S.C. § 331 (misbranding of a substance intended for human consumption). Federal agents with the Department of Homeland Security, Immigration and Customs Border Enforcement, the Internal Revenue Service Criminal Investigations unit, and the U.S. Postal Inspector Service sought and obtained search warrants in Kentucky, a variety of locations in Missouri, and Tennessee, for storage facilities, residences, businesses and email accounts. Search warrants were pursued, in part, after packages addressed to *Palmer* co-defendants were intercepted by Border Patrol agents in Anchorage, Alaska (addressed to Paggregate, LLC), and Chicago, Illinois that originated in China, and which contained multiple kilograms of the synthetic cannabinoids known as AKB48 and XLR-11. The search warrants were obtained between September 2013 and June 2014.

Investigators also obtained bank and business records; conducted source interviews and physical surveillance; coordinated trash pulls and arranged a confidential informant (CI) buy from an individual who was associated with a *Palmer* co-defendant's business. One such interview occurred when co-defendant John Galvin was stopped in a vehicle by the Missouri Highway Patrol on September 17, 2013 while attempting to deliver 150 packages of "aroma"

products to a store for defendant Wolfe. Galvin admitted to delivering 800 packages in total. Additionally, the CI's purchase of synthetic cannabinoids arrived from Paggregate, LLC, a *Palmer* co-defendant associated business. Agents searched properties owned or controlled by defendant Wolfe in St. Peters and Bridgeton, Missouri. They searched and seized suspicious packages found at UPS Store #869 at 6025 Stage Road, Bartlett, Tennessee which contained JWH-018, a known synthetic controlled substance. The specific search warrants challenged by defendant Wolfe are:

| Warrant Number | Location Searched |
|---|---|
| 13-SW-124 (WD Tenn) | UPS Store #869, 6025 Stage Rd., Bartlett, TN 38134 Box #327 |
| 4:13MJ7219 SPM | 1901 Williamstown Dr., St. Peters, MO 63376 |
| 4:13MJ7220 SPM | 13761 St. Charles Rock Road, Ste. 118, Bridgeton, MO 63044 |
| 4:13MJ7221 SPM | 13765 St. Charles Rock Road, Ste. 101, Bridgeton, MO 63044 |
| 4:13MJ7222 SPM | 13765 St. Charles Rock Road, Ste. 102, Bridgeton, MO 63044 |
| 4:13MJ7223 SPM | 13765 St. Charles Rock Road, Ste. 111, Bridgeton, MO 63044 |
| 4:13MJ7224 SPM | 13765 St. Charles Rock Road, Ste. 115, Bridgeton, MO 63044 |
| 4:13MJ7225 SPM | 13765 St. Charles Rock Road, Ste. 116, Bridgeton, MO 63044 |
| 4:13MJ7226 SPM | 13765 St. Charles Rock Road, Ste. 121, Bridgeton, MO 63044 |
| 4:13MJ7227 SPM | 4738 Orchard Drive, Barnhart, MO 63102 |
| 4:13MJ7268 SPM | Storage Unit F80 U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO |
| 4:13MJ7269 SPM | Storage Unit F81 U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO |
| 4:13MJ7270 SPM | Storage Unit F37 U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO |

| | |
|---|---|
| 4:13MJ7271 SPM | Storage Unit F38 U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO |
| 4:13MJ6184 TCM | Unit D17 U-LOK & STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO |
| 4:13MJ6185 TCM | Unit D21 U-LOK & STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO |
| 4:13MJ6186 TCM | Unit E004, PUBLIC STORAGE 3760 Pennridge Drive, Bridgeton, MO |
| 4:14MJ7001 SPM | Email account:   **********61@yahoo.com |
| 4:14MJ7002 SPM | Email Account:  *******1971@yahoo.com |
| 14-2007 MK (MD Tenn) | International Express Mail Package EE931645513CN addressed to PALMCORP LLC 4117 Hillboro Pike, Ste 103, Suite 363, Nashville, TN 37215 |
| 3:14MJ196 (WD KY) | International Express Mail Package EE929751116CN addressed to Tony Palmer, Mystic Wholesale LLC, 3175 South 2nd Street, Suite #361, Louisville, KY 40208 and |
| | Federal Express Package 803501809310 addressed to Tony Palmer, Mystic Warehouse LLC 3175 South 2nd Street Suite #361 Louisville, KY 40208 |
| 4:14MJ6111 TCM | Unit G730 Ample Storage 2960 Elmpoint Industrial St. Charles, MO 63301 |
| 4:14MJ6112 TCM | Unit I606 2960 Elmpoint Industrial St. Charles, MO 63301 |
| 4:14MJ7119 SPM | 21 Winding Stairway, O'Fallon, MO 63368 |

None of the affiant-special agents had formalized scientific education in molecular or organic chemistry.  These affiants had extensive generalized training and experience in drug trafficking investigations, including synthetic cannabinoid investigations.  They also researched these substances and they relied on materials published by the DEA Office of Diversion Control, the DEA Deputy Administrator and the DEA Scheduling system of such designer drugs.  They

reviewed drug-user internet forums, Wikipedia pages, and unnamed source material from studies and surveys on these topics. (*E.g.*, Gov't Ex. 1, at 14-15). Based on this information, the agents believed there was probable cause for the issuance of the challenged search warrants.

In response, defendant Wolfe's scientific expert, Allen S. Kesselring, Ph.D., has filed a declaration in support of his *Franks* motion. (Doc. No. 586, Def. Exs. 10 through 14).

## Conclusions of Law

Defendant sets forth two grounds for suppression of the 24 search warrants: (1) the affidavits contain statements or omissions made with reckless disregard for the truth, and (2) once the information is erased from the supporting affidavits, they lack sufficient probable cause. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978).

### 1.      Defendant's Motion for a *Franks* Hearing[4]

The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

*United States v. Montes-Medina*, 570 F.3d 1052, 1059 (8th Cir. 2009). The Supreme Court has defined probable cause to search as "a fair probability that the contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). To be valid, a search warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be searched. *Johnson v. United States*, 333 U.S. 10 (1948); *Warden v. Hayden*, 387 U.S. 294 (1967). *See also*, Fed. R. Crim. P. 41. Stated another way:

---

[4] The undersigned concurs with the detailed conclusions of law issued by Judge Noce in the *Palmer* case in their entirety.

If an affidavit in support of a Search Warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,' "probable cause to issue the warrant has been established."

*United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006)).

There are circumstances, however, where a search warrant may be invalid if the issuing judge's probable cause determination was based on an affidavit that contained false statements, and that such statements were made knowingly and intentionally or with reckless disregard for the truth. A defendant's entitlement to a *Franks* hearing requires him or her to make a substantial preliminary showing that a material statement in a search-warrant affidavit was made by the affiant with reckless disregard for whether the statement was true or was a deliberate falsehood. *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002); *United States v. Anderson*, 243 F.3d 478, 482 (8th Cir. 2001). To prevail on a *Franks*-type challenge to the validity of a search warrant, a defendant bears the burden to establish by a preponderance of the evidence that the affiant, either knowingly and intentionally or with reckless disregard for the truth, included a false statement within the warrant affidavit. *Franks*, *supra*, 438 U.S. at 155-56. Mere negligence or innocent mistake is insufficient to void a search warrant. *Id.* at 171. The test for determining whether an affiant's statements were made with reckless disregard for the truth is whether, viewing all of the evidence, the affiant must have entertained serious doubts as to the accuracy of the information he reported. If the defendant makes such a showing, then the court must consider whether the information in the affidavit, absent the false material, is sufficient to establish probable cause.

During a *Franks* hearing, the court may consider facts outside the four corners of the search warrant affidavit in order to determine the affiant's state of mind. *United States v. Finley*,

612 F.3d 998, 1002-03 (8th Cir. 2010). "A showing of deliberate or reckless falsehood is not lightly met." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010).

### a. There Is No Requirement That Affiants Must Be Scientific Experts

Defendant Wolfe claims that the affiants, because they lack formal education in chemistry, were not qualified to attest to the scientific conclusions made about the controlled substances and their analogues in the affidavits. (*Palmer*, ECF No. 224, at p. 6). Defendant supports his argument with the sworn declaration of chemist Allen S. Kesselring, Ph.D. (Doc. 586, Def. Ex. 12). The undersigned does not find that this claim, regardless of the declaration, meets the substantial showing required for a *Franks* hearing.

First, the Supreme Court has determined what quantum of evidence is needed to meet this probable cause standard:

> In dealing with probable cause, … however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Brinegar v. United States*, 338 U.S. 160, 175 (1979).

Contrary to defendant Wolfe's argument, neither the Fourth Amendment nor the courts require that an affiant marshal trial-worthy proof or have the expertise of a high-level scientist for a judge to issue a search warrant in a drug investigation. Such qualifications are irrelevant. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993).[5] And defendant Wolfe is not entitled to a *Daubert* hearing by way of a *Franks* hearing. The legal standard here is a lesser one, which is based on a "fair probably of criminal activity," and "not guilt beyond a

---

[5] The Supreme Court crafted in *Daubert* a number of non-exhaustive factors that might assist the trial court in determining the admissibility of expert evidence: (1) whether the theory or technique applied can be tested, (2) whether the theory or technique has been subject to peer review or publication, (3) the known or potential rate of error, and (4) whether it is accepted in the relevant discipline. *Id.* at 593–94, 113 S.Ct. 2786.

reasonable doubt." *United States v. Harris*, 403 U.S. 573, 584 (1971). There is universal acknowledgement among the courts that probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *See Illinois v. Gates*, 462 U.S. at 232.

Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* Probable cause may be based on the totality of the circumstances present and, as a result, affidavits should not be read in a grudging, hyper-technical fashion. *See United States v. Ventresca*, 380 U.S. 102, 109 (1965). *See also United States v. Palmer*, Case No. 4:14 CR 00175 AGF-DDN, ECF Doc. 292, at p. 18 ("Whether law enforcement affiants are qualified to determine if the chemical structures of substances are, in fact, substantially similar to controlled substances is irrelevant. The agents only need to provide the issuing judge with 'probable cause' that the substances were substantially similar to controlled substances."). *See, also, United States v. Riley*, 2014 WL 537013, at *3 (D. Neb. Feb. 7, 2014)("As members of federal agencies tasked with enforcing the drug laws, [agents] were qualified to make this assessment."). Moreover, to meet the "fair probability" requirement, the affiants could reasonably rely on information known by their counterparts at the DEA, which is the delegated federal agency tasked with identifying designer drugs and then scheduling controlled substances and their analogues if certain requirements are met. *Touby v. United States*, 500 U.S. 160, 167–68, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (affirming denial of motion to dismiss indictment on the grounds that § 201(h) of the Controlled Substances Act, 98 Stat. 2071, 21 U.S.C. § 811(h)

unconstitutionally delegates legislative power to the Attorney General, and that the Attorney General improperly delegated his temporary scheduling authority to the DEA).[6]

Second, the affiants have extensive training and experience, individually and collectively, with numerous drug investigations and economic crimes related to drug trafficking. To the extent that defendant Wolfe suggests that *had* affiants possessed formal scientific training or authored studies about these matters they would not have made the statements contained in the affidavits, the court is aware that experts within a particular field of study do not always agree on such matters within the relevant scientific community. *See, e.g., Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012). The *Wyeth* Court noted,

> The standard for judging the evidentiary reliability of expert evidence is "lower than the merits standard of correctness."
> *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).
> Proponents of expert testimony need not demonstrate that the assessments of their experts are correct, and trial courts are not empowered "to determine which of several competing scientific theories has the best provenance." *Milward v. Acuity Specialty Prods. Grp.*, 639 F.3d 11, 15 (1st Cir. 2011)(quoting *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 83 (1st Cir. 1998)); see Fed. R. Evid. 702 advisory committee's note (discussing 2000 amendments) ("When a trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable.").

Thus, it was not *per se* reckless for the affiants in this case, who needed only to establish the lesser standard of a "fair probability" that a crime was occurring, to agree with or to set forth a competing scientific theory like what is held by defendant Wolfe's expert. And they had a good

---

[6] The Supreme Court in *Touby* noted "[f]rom the time when law enforcement officials identify a dangerous new drug, it typically takes 6 to 12 months to add it to one of the schedules. S.Rep. No. 98-225, p. 264 (1984), U.S. Code Cong. & Admin. News 1984, p. 3182. Drug traffickers were able to take advantage of this time gap by designing drugs that were similar in pharmacological effect to scheduled substances but differed slightly in chemical composition, so that existing schedules did not apply to them. These 'designer drugs' were developed and widely marketed long before the Government was able to schedule them and initiate prosecutions." 500 U.S. at 1754-1755 (citation omitted).

faith basis for putting forth their facts as discussed below. The record bears no reason to doubt that the agents could fairly rely on the legitimate scientific research they used and other material, and then comment on it accurately in affidavits to the issuing judges. And there is no evidence that these affiants did knowingly and intentionally or with reckless disregard for the truth entertain "serious doubts as to the truth of [their] statements or had obvious reasons to doubt the accuracy of the information [they] reported," simply because they lacked advanced degrees in science. *United States v. McIntyre*, 646 F.3d 1107, 1113-14 (8th Cir. 2011) (quotation omitted). This point should be denied.

**b.      The Affidavits Do Not Contain False Statements or Omissions**

Defendant Wolfe argues that the search warrant affidavits contain material omissions and inclusions of false information that misled the issuing judges. He contends that the affidavits were drafted with reckless disregard for the truth because they cite to unreliable source material like Wikipedia, and use of the incorrect DEA Control Number 7201 in the "Orchard Drive" search warrant. Defendant also attacks the suitability of using the functionary chemical placeholders of "R1" and "R2" in the "Orchard Drive" and "Yahoo Email" search warrants without a companion structural illustration. Quoting Dr. Kesselring, defendant claims that the substances AKB48 and 5F-AKB48 are misleadingly characterized as controlled substance analogues of Schedule I drugs JWH-018 and AM2201. He claims that if the affidavits intended to suggest that a "'similar structural relationship' to JWH-018 and AM2201 (cannabimimetic agents) is sufficient to meet the § 802(32)(A)(i) criteria of 'substantially similar to,'" this is a falsehood, according to Dr. Kesselring. Defendant Wolfe further contends that (a) the use of the term "structurally related" is misleading because it is scientifically undefined, without precise meaning and; (b) AKB48 and 5F-AKB48 are not subject to any of the five classes of compounds

listed as cannabimimetic agents in 21 U.S.C. § 812.  (Doc. No. 586).  Additionally, defendant

Wolfe contends based on Dr. Kesselring's declaration, that the affidavits' claim that substances

AB-PINICA and AB-FUBINACA are cannabimimetic indazole-derivatives is misleading

because it leaves out the statement that these substances do not fall within any of the defined

structural classes of 21 U.S.C. § 812.  Although his claims of omissions, falsehoods or reckless

use of sourced material are wide ranging, the undersigned joins with another Magistrate Judge of

this court and finds that his combined complaints do not satisfy the threshold requirements for a

*Franks* hearing on this record.

### i.      The Omissions As To AKB48 and 5F-AKB48 And AB-PINICA and AB-FUBINACA Are Not Clearly Critical

Defendant Wolfe has failed to establish that the lack of precise scientific language when

discussing AKB48 and 5F-AKB48 was clearly critical to the probable cause finding.  *See, e.g.,*

*United States v. Gonzalez*, 781 F.3d 422, 431 (8th Cir. 2015)(denying defendant's claims that

omissions from the search warrant affidavit were material where defendant failed to show

recklessness on the part of the affiant that the omitted material was 'clearly critical' to the

probable cause determination).  He argues that the absence of both legal and scientific clarity

about the status of these compounds was misleading.  If the compounds fit neither the legal nor

scientific definitions of a controlled substance, or a controlled substance analogue; nor are they

prohibited cannabimimetic agents, they are lawful to sell and doing so would not support a

probable cause finding for search warrants to issue.  In support, defendant Wolfe relies on Dr.

Kesselring who opined,

> To conclude that AKB48 and 5F-AKB48 are controlled substance analogues
> of JWH-018 and AM2201 on that basis would be to say that "structurally related"
> is sufficient to meet the § 802(32)(A)(i) criteria of "substantially similar to".
> If this were scientifically true (which it is not), then the common and essential

amino acid tryptophan, having structural relation to several schedule I controlled substances, could be considered a controlled substance analog on the same basis (which it is not).

(*Palmer*, ECF No. 227, Ex. 12, ¶ 7).[7]

This argument misses the mark. As a threshold matter, the government has countered that AKB48 was temporarily scheduled (on May 16, 2013), at the time the search warrants issued and 5F-AKB48 is a controlled substance analogue of AKB48, not JWH-018 and AM2201. *See* (*Palmer*, ECF No. 263, at p. 36); (Gov't Response, Doc. No. 560, at p. 7). Therefore, investigators could pursue defendant Wolfe and his alleged trafficking of these chemical substances at the time the search warrants issued. Second, even so "[t]he CSAEA does not, however, require the DEA to classify a substance as a controlled substance analogue before the substance falls under its purview." *United States v. Sullivan*, 714 F.3d 1104, 1107 (8th Cir. 2013). Therefore, defendant Wolfe's general claim that affiants were reckless in their pursuit of search warrants is not well founded; nor is it enough to meet the *Franks* test. Additionally, the affidavits do not track the statutory definition of the Analogue Act regarding "substantially similar to" language when discussing AKB48 and 5F-AKB48. (Doc. No. 560, Gov't Response, at p. 5). *See* U.S.C. § 802(32)(A)(defining the term controlled substance analogue). The undersigned agrees that the lack of such a statement instead, "fairly implied to the issuing judge that these substances were outside the statutory classes." *See Palmer*, Case No. 4:14 CR 00175 AGF-DDN, ECF. No. 292, at p. 21.

The use of the phrase "structurally related," even though attacked as scientifically imprecise by Dr. Kesselring, cannot be clearly said to have been used by the affiants in an effort

---

[7] Defense counsel explained at the *Palmer* hearing that they asked Dr. Kesselring to limit his review to a sampling of search warrants that contained the same language because the same affidavit was used multiple times in support of several search warrants. *See* (Doc. No. 586, Def. Exs. 2-I, 5-B, and 9).

to mislead the issuing judges that the compounds are "substantially similar to" controlled substance JWH-018 and AM2201 under the Analogue Act. At the same time, defendant Wolfe has lodged a similar attack against the statutory language "substantially similar to," calling it vague and lacking precise scientific meaning. This argument has been repeatedly and resoundingly rejected by the courts. Disagreements among scientists on the subject of substantial similarity have not led the Eighth Circuit to decide that the Analogue Act is impermissibly vague. Instead, the standard is clearly drawn as to the reasonable lay person who can compare diagrams, and analyze chemical charts to make an intelligent decision about the similarity of substances. *United States v. Washam*, 312 F.3d 926, 932 (8th Cir. 2002). "When considering whether the Analogue Act is impermissibly vague, the Court looks to the legal definition of a statutory term [substantially similar], not the scientific definition." *United States v. Franklin*, 2014 WL 1953077, at *7-8 (W.D. Mo. May 15, 2014)(quoting *United States v. Brown*, 279 F. Supp. 2d 1238, 1240 (S.D. Ala. 2003)("Since the Analogue Act does not indicate that the term 'substantially similar' is to be defined as it is used scientifically, the court will interpret those words as they are used in everyday language.").

Compounds fitting the statutory criteria may be subject to the penalties of the Analogue Act, so long as defendant knew that they were controlled substance analogues intended for human consumption. 21 U.S.C. § 802(32)(A). The government must prove the following essential elements:

> (1) substantial chemical similarity between the alleged analogue and a controlled substance; (2) actual, intended, or claimed physiological similarity (in other words, that the alleged analogue has effects similar to those of a controlled substance or that the defendant intended or represented that the substance would have such effects); and (3) intent that the substance be consumed by humans.

*United States v. Carlson*, 810 F.3d 544 (8th Cir. 2016).   Simply put, the government must prove

both chemical similarity and similarity as to pharmacological effect on the human body when

consumed.  With these legal principles in mind, the affidavits sufficiently set forth facts,

including that there are no published studies about the therapeutic or commercial uses for these

compounds, to support the finding that the omissions were not clearly critical.  *Franks*, 438 U.S.

at 155-56.  This point should be denied.

Defendant Wolfe also contends based on Dr. Kesselring's declaration, that the affidavits'

claim that substances AB-PINICA and AB-FUBINACA are cannabimimetic indazole-

derivatives is misleading because it leaves out the statement that these substances do not fall

within any of the defined structural classes of 21 U.S.C. § 812 (the Synthetic Drug Act

(SDAPA)).  (*Palmer*, ECF No. 227, Ex. 12, ¶ 9).  The affidavits call AB-FUBINACA a "new

synthetic cannabinoid."  (*Id.* at Ex. 2-I, ¶ 22).  However, as stated above, a substance can still be

a controlled substance analogue without being within a recognized structural class of

cannabimimetic agents.  21 U.S.C. § 802(32)(A).  The undersigned agrees with another judge of

this court that "had the affidavit affirmatively stated that AB-PINICA and AB-FUBINACA were

not in the structural classes of cannabimimetic agents, the issuing judge could still find by a fair

probability that the substances were new analogue drugs not yet listed in the schedule but

structurally similar under the definition of § 802."  *Palmer*, Case No. 4:14 CR 00175 AGF-DDN,

ECF Doc. 292, at p. 23.  Moreover, the affidavits explained that they were investigating potential

violations of manufacturing and distribution of substances without proper labeling, when

intended for human consumption.  21 U.S.C. § 331.  This is an alternate line of investigation

upon which the affidavits have sufficient probable cause for search warrants to issue.  *United*

*States v. Ways*, 832 F.3d 887, 894 (8th Cir. 2016)("The execution of a search warrant—so long

as it is supported by probable cause—may reveal the expected criminal conduct, criminal conduct other than what was expected, or no criminal conduct at all.").  This point should be denied.

### ii. Mistakes Regarding Citations To DEA Control Number 7201 Do Not Warrant A *Franks* Hearing

The government concedes that the "Orchard Drive" search warrant affidavit refers incorrectly to DEA control #7201 when it should have referenced DEA control #7048.  The difference means that 5F-AKB48 was identified as a controlled substance analogue of AM2201 in error, according to Dr. Kesselring.  Defendant argues that this is a material misstatement.  At best, on this record, the error was an innocent or negligent mistake and not the product of deliberate or reckless disregard for the truth.  *Franks*, *supra*.  Moreover, the government's position on this point is consistent with its argument that affiants did not knowingly and intentionally or recklessly omit that 5F-AB48 was not "substantially similar" to AM2201 under the Analogue Act as discussed above in Section 1(b)(i).  *See* (Gov't Response, Doc. No. 560, at pp. 7-9).  This point should be denied.

### iii. References to "R1" and "R2" Without Illustration Is Not So Misleading As To Result In A Falsehood

Defendant Wolfe argues that the affiants should have used a corresponding illustration when discussing the chemical placeholders of "R1" and "R2" in the "Orchard Drive," "Winding Stairway" and a "Yahoo Email" search warrant.  According to Dr. Kesselring, the absence of an illustration is careless and misleading because the issuing judges had to make assumptions about the context of R1 and R2 relative to the atomic structure being discussed, and the scientific conclusions offered.  Defense counsel argued at the hearing held in the *Palmer* case that this was an "amateur[ish] cut-and-paste job."  *See* (*Palmer*, ECF No. 263, at p. 19).  Defendant Wolfe

also argues that the omission of a corresponding illustration further shows the affiants' lack of

understanding about the science of controlled substance analogues and why these law

enforcement agents had insufficient training and experience to be reliable.

> The affidavits state:

> AKB48 and 5F-AKB48 … are structurally related to other synthetic cannabinoids with core indole structure, such as the Schedule I substances JWH-018 and AM2201. These court structures (scaffolds) are substituted at the 1- and 3- positions (R1 and R2, respectively) to give rise to the substances.

(*Palmer*, ECF No. 227, Def. Exs. 2-I and 5-A).

Defendant Wolfe's main critique is that the information is hard to understand without a

visual representation because best practices would dictate that a thorough explanation of R1 and

R2 would be illustrated with citation to vetted scientific research. While the affiants did not

provide an illustration with attribution, this is not so reckless that it meets the test under *Franks*.

*See also Finley*, 612 F.3d at 1002-03. Negligence and innocent mistake are insufficient to prove

reckless disregard for the truth or intentional falsehood. *Id.* The undersigned does not find that

the record indicates that the affiants must have entertained serious doubts as to the truth of this

statement or had obvious reasons to doubt the accuracy of this information. Moreover, the

statements regarding R1 and R2 are not challenged as false and they were not vital to the

explanation about the pharmacological effects of AKB48 and 5F-AKB48 on the human body

under the Analogue Act. The affidavits included other information in support of its conclusions

as discussed above. Therefore, this point should be denied.

### iv. Citation To Wikipedia

Defendant contends that Wikipedia is an unreliable source and reference to it about AB-

FUBINACA was done with reckless disregard for the truth because anyone with internet access

can contribute to or edit a Wikipedia page or "stub." He argues that the use of the website in the

"Orchard Drive" affidavit is further evidence that affiants were not properly schooled in the language of advanced science or the academic hierarchy of proper source material to be cited. While it can be problematic for the government to rely on Wikipedia as evidence in some circumstances, the record does not support that the use of the website here was done with reckless disregard for the truth under *Franks*. *See Badasa v. Mukasey*, 540 F.3d 909 (8th Cir. 2008)(remanding asylum case where Department of Homeland Security offered evidence from Wikipedia before an immigration judge); *See also Campbell v. Sec'y of Health and Human Servs.*, 69 Fed. Cl. 775, 781 (Fed. Cl. 2006) (noting that a review of the Wikipedia website "reveals a pervasive and, for our purposes, disturbing set of disclaimers"); *But see United States v. Bazaldua*, 506 F.3d 671, 673 n.2 (8th Cir. 2007)(citing to Wikipedia for a definition of a term). In this case, defendant Wolfe has not demonstrated that the Wikipedia material was false, altered or interpreted by affiants with reckless disregard for the truth. If Wikipedia was the only source upon which the affiants relied, the court might take a different view. Affiants did also cite to *1, 2 Forensic Toxicology* and the Wikipedia article does cite to the Pfizer patent. Like the Eighth Circuit acknowledged in *Bazaldua*, Wikipedia can provide reliable definitions, and defendant Wolfe does not allege that the statement about AB-FUBINACA is false. *Id.* (Doc. No. 586, Ex. 14-A). This point should be denied.

> **2.      Defendant's Motion To Suppress Evidence**
>
> **a.      The Search Warrants Are Supported By Probable Cause**

As stated above, the probable cause findings of the issuing judges should not be overturned under *Franks v. Delaware* because defendant's Wolfe has not made a substantial preliminary showing as to those factors. Because there is no basis to edit out paragraphs 9-11, 16-23, 30a-30b, and 51 from the search warrants, the undersigned finds that when reviewed as to

the four corners of the affidavits, there is sufficient probable cause. The court makes the determination by looking at the totality of the circumstances. *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2006). And the issuing judge is to be awarded great deference. *Id.* The outcome would be no different if the court did not consider the paragraphs of which he complains because defendant was under investigation for several crimes, in addition to 21 U.S.C. §§§ 813, 841 and 846. Count II alleges a conspiracy to introduce and to receive misbranded drugs in interstate commerce, in violation of 18 U.S.C. § 371 and 21 U.S.C. §§ 331 and 333. Count III alleges a conspiracy to launder money, in violation of 18 U.S.C. §§ 1956 and 1957. There was sufficient probable cause to support search warrants on those other grounds. *Ways*, 832 F.3d at 894.

In this case, defendant Wolfe overlooks the totality of the investigation and other material included in the affidavits. Investigators tracked suspicious mail packages containing synthetic drugs opened at the U.S. borders in Anchorage, Alaska and Chicago, Illinois. Investigators were familiar with the use of the mail systems to ship synthetic drugs and facilitate their manufacture. They conducted physical surveillance and consent searches. They made trash runs and obtained financial information about defendant Wolfe and co-defendants and large monetary payments. The affiants also targeted evidence of the distribution of XLR11 and AM2201, which were scheduled in some manner under the Analogue Act at the time the search warrants issued. Additionally, co-defendant John Galvin provided a statement after a traffic stop about his working relationship with defendant Wolfe that involved the delivery of the chemical substance XLR11. All of this provided sufficient probable cause to believe that evidence of one or more crimes would be found at defendant Wolfe's business locations, or storage units he controlled, and at his home. This point should be denied.

Likewise, the search warrants issued for the Bridgeton, Missouri storage units are based on probable cause for the reasons stated above and the additional reason that a confidential informant ordered illegal analogues from an individual who was also targeted with defendant Wolfe and co-defendants in the *Palmer* case. The FedEx envelope sent to the CI with variety of illegal substances came from Paggregate, LLC, which is the drug distribution company maintained by co-defendant Mark Palmer in the *Palmer* case. *See* (ECF No. 227, Exs. 3-A to 4-C). Investigators can establish probable cause for a search warrant based on information supplied by a reliable informant. *See United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013). Additionally, the residence of an employee of defendant Wolfe was searched, leading investigators to other evidence linking defendant Wolfe, his son and the employee to the St. Charles, Missouri storage units where they assembled aroma products. This point should be denied.

In addition, the Yahoo email address accounts searched by investigators were done so based on probable cause. The affidavits explain that certain substances were subject to either emergency scheduling in March 2011 or a temporary schedule in May 2013. And the affidavits refer to other search warrants served on other email accounts that are relevant to the investigation. These emails were attached to the Yahoo affidavits and they discuss legislation about synthetic cannabinoids and the impact on defendant's Wolfe's business, his financial transactions for his products, and customer orders for drugs. Finally, defendant's oral argument at the *Palmer* hearing that each search warrant issued after the first "Orchard Drive" search warrant should be suppressed as fruit of the poisonous tree is without merit because the "Orchard Drive" search warrant was based on probable cause. *See* (*Palmer*, ECF No. 263, at p. 21-24).

### b. Affiants Relied In Good Faith On The Issuance Of The Search Warrants

"Even if the affidavit were deemed deficient in hindsight, moreover, evidence would not be suppressed if the police acted in good faith reliance on a search warrant issued by a neutral and detached magistrate." *United States v. Lucca*, 377 F.3d 927 (8th Cir. 2004); citing *United States v. Leon*, 468 U.S. 897, 922–23 (1984). In *Leon*, the Supreme Court considered whether the exclusionary rule should apply in the case where the lower courts concluded that the subject search warrant was not supported by probable cause in the attached affidavit. The Supreme Court weighed the question of whether the issuing judge acted with detached and neutral scrutiny and decided if so, then the judge's probable cause ruling should be given deference. 468 U.S. at 913-14. Here, defendant has not shown that the issuing judges acted other than in a detached and neutral manner. It follows from the totality of the circumstances of this case that the issuing judges acted in a way that was consistent with "the detached scrutiny of a neutral magistrate." *Id.* at 913. There is no evidence before this court that indicates that the issuing judges acted as a "rubber stamp for the police." *Id.* at 914.

Next, the Supreme Court considered that deference to the issuing judges may diminish in light of the type of knowing or reckless falsity in the affidavit that was the subject of *Franks v. Delaware*, 438 U.S. 154 (1978). The undersigned has found there has been no substantial showing that would warrant a *Franks* hearing as to the challenged search warrants. *Finley*, 612 F.3d 998 at 1002-03.

Further, the Supreme Court considered that applying the exclusionary rule,

> is not necessary meaningfully to inform judicial officers of their
> errors, and we cannot conclude that admitting evidence obtained
> pursuant to a warrant while at the same time declaring that the
> warrant was somehow defective will in any way reduce judicial
> officers' professional incentives to comply with the Fourth

Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests.

*Leon*, 468 U.S. at 917.

Finally, the Supreme Court considered whether the form of the issued warrant was technically sufficient. *Id.* at 921. There is no evidence here to the contrary. Moreover, the Eighth Circuit has stated

> We have recognized four circumstances that preclude a finding of good faith: "(1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid."

*Id.* (quoting *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011)). In evaluating a search under *Leon*, we "must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015). The warrants issued here met the requisite criteria. Because agents had probable cause for the search warrants and they relied in good faith on their issuance, the evidence was seized lawfully.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant Charles Wolfe's Motion For A *Franks* Hearing (Doc. No. 586) be **denied**.

**IT IS FURTHER RECOMMENDED** that defendant Charles Wolfe's Motion To Suppress Evidence (Doc. No. 587) be **denied**.

Further, the parties are advised that they have fourteen (14) days to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to timely file objections may result in the waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990).

**IT IS HEREBY ORDERED** that the trial of this case will be set at a later date by the presiding District Judge Rodney W. Sippel.

/s/ Noelle C. Collins
United States Magistrate Judge

Dated this 14th day of December, 2016.